Merle Joy Turchik, AZ Bar No. 011130
TURCHIK LAW FIRM, P.C.
2205 E. Speedway Blvd.
Tucson, AZ 85719
merle@turchiklawfirm.com
Telephone: (520) 882-7070
Facsimile: (520) 203-0175

David Sanford (D.C. Bar No. 457933, *Pro Hac Vice to be forthcoming*)
SANFORD HEISLER SHARP, LLP
1666 Connecticut Avenue NW, Suite 300
Washington, D.C. 20009
dsanford@sanfordheisler.com
Telephone: (202) 499-5201
Facsimile: (202) 499-5199

*Attorneys for Plaintiff and the EPA Collective Action Class*
*[Additional Attorneys Listed After Signature Page]*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia MacCorquodale, on behalf of herself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>Arizona Board of Regents,<br><br>Defendant. | Case No.:<br><br>COLLECTIVE ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Patricia MacCorquodale ("Dr. MacCorquodale"), by and through her undersigned counsel brings this action in her individual capacity, and on behalf of all others similarly situated, against Defendant Arizona Board of Regents ("ABOR" or "the Board") to redress systematic gender discrimination in employment. Plaintiff alleges upon knowledge concerning herself and her own acts, and upon information and belief as to all other matters, as follows:

//

## I.   OVERVIEW

1. Dr. MacCorquodale is a tenured Professor in the Department of Gender and Women's Studies at the University of Arizona (the "University" or "UA"). She is also Dean Emerita of the University's Honors College (the "Honors College" or the "College"), which she led from its creation in 1999 until 2016.

2. Under her leadership, the Honors College became a hub of intellectual life at the University, attracting undergraduate students from Arizona and nationwide who might otherwise not have attended the University, and contributing to the University's reputation internationally.

3. A five-year review committee convened in 2011 to assess Dr. MacCorquodale's performance found that she "has done an admirable job" in her role and that her "passion and hard work have been fundamental to the success of the Honors College." Dr. MacCorquodale has an established reputation of making the Honor's College her life's work, selflessly dedicating herself to building the College and enriching the lives of her students.

4. UA Provosts have consistently recognized Dr. MacCorquodale's exceptional leadership and incredible success as the Dean of the Honors College. In 2010, then-Provost Meredith Hay commended Dr. MacCorquodale on a "tremendous job in leading the college in these difficult times" and for her "exceptional flexibility in adapting to new circumstances in an ever-changing financial environment." Current Provost Dr. Andrew Comrie observed in 2012 that Dr. MacCorquodale was "increasingly adept at leading with the University of Arizona Honors College's advantages."

5. During her entire tenure as Dean, the University dramatically underpaid Dr. MacCorquodale relative to her male colleagues, including her younger, male successors, by tens of thousands of dollars or more. After Dr. MacCorquodale stepped down as Dean in September 2016, she was replaced by a younger and less experienced male interim dean who was offered a full-time salary as Honors College Dean that was more than $100,000 higher than Dr. MacCorquodale's pay in her last full academic year.

6. This pay disparity is a direct result of policies and practices implemented by the University's leadership, including the current Provost. Female deans at the UA earn less than male deans and are virtually shut out of participation in the University's Dean's Council. They are further subjected to humiliating and demeaning treatment by the University's male leadership to which their male peers are not subjected.

7. This action arises out of the University's systematic discriminatory treatment of its female deans on the basis of their gender. The University discriminates against female deans through its policies, practices, and procedures with respect to compensation, in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").

8. On behalf of herself and all others similarly situated, Plaintiff MacCorquodale requests declaratory and injunctive relief to redress the University of Arizona's pervasive and discriminatory employment policies, practices, and procedures, including its retaliation against her for reporting such discriminatory misconduct. Plaintiff further seeks for herself, and all others similarly situated, back pay; front pay; compensatory damages; nominal, liquidated, and punitive damages; and attorneys' fees and costs.

## II. THE PARTIES

### A. Plaintiff Patricia L. MacCorquodale

9. Plaintiff Patricia MacCorquodale resides in Tucson, Arizona, and is a citizen of the United States. She has been an employee of the University of Arizona since August 1978.

### B. Defendant Arizona Board of Regents

10. Defendant Arizona Board of Regents is a corporate entity created by state law for the purpose of administering Arizona's public universities. Its headquarters are at 2020 North Central Avenue, Suite 230, Phoenix, Arizona.

11. The University of Arizona, a public university located in Tucson, Arizona, is a legal subdivision of ABOR. At all relevant times, ABOR controlled the UA, which has been Dr. MacCorquodale's employer within the meaning of all relevant statutes.

12.     The University employs more than 15,000 individuals.

**C. Administrative Exhaustion and Tolling**

13.     Plaintiff timely filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on May 16, 2017, and amended her charge on July 21, 2017. Dr. MacCorquodale is in the process of perfecting her right to sue to bring claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 42 U.S.C § 2000e *et seq.* ("Title VII"). [1]

14.     On September 7, 2017, the parties entered into a tolling agreement, tolling Dr. MacCorquodale's claims under Title VII, the EPA, and other applicable statutes beginning from May 16, 2017 until November 15, 2017 (six months), when the University terminated tolling.

**III.   JURISDICTION AND VENUE**

15.     The U.S. District Court for the District of Arizona has personal jurisdiction over Defendant because Defendant's offices are headquartered in Arizona, it conducts business in Arizona, and the acts complained of and giving rise to the claims alleged herein occurred in Arizona.

16.     This Court has original subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and § 1343 because this action involves claims brought under the EPA.

**IV.    FACTUAL ALLEGATIONS**

**A.      The University of Arizona**

17.     The Arizona Constitution established the twelve-member Arizona Board of Regents as the governing body for the state's public university system, including the University of Arizona, to provide management and direction to the state's higher education institutions.

---

[1] Plaintiff intends to amend her Complaint to include individual claims under Title VII once she has been granted a right to sue from the EEOC.

18. Founded in 1885, the University of Arizona – the state's flagship institution of higher education – is one of the country's leading public universities. As a premier research institution, the UA brings in more than $606 million annually in research investment and has an economic impact of $8.3 billion annually in the state of Arizona. With over 15,000 employees for the 2016-2017 academic year, the UA is one of the largest employers in southern Arizona.

19. As the University's chief academic officer, the Provost is responsible for promoting the University's mission in education and research. Charged with overseeing all aspects of academic programming, the Provost works closely with the Deans' Council – the committee of all academic deans at the UA – to craft the strategic plan for the University's academic future.

20. Since August 2012, Dr. Comrie has served as Provost and Senior Vice President for Academic Affairs, initially as an interim Provost for the 2012-2013 academic year and as Provost since 2013. As Provost, Dr. Comrie has been responsible for making administrative appointments, such as appointments of deans, and for setting the salaries of administrative appointees. Accordingly, deans' salaries have been largely controlled by a single, common decision-maker throughout the relevant period.

**B.   Dr. Patricia L. MacCorquodale**

21. Dr. MacCorquodale earned a Bachelor of Arts in Sociology from Carleton College in 1972 and a Master of Arts and Ph.D. in Sociology from the University of Wisconsin at Madison in 1974 and 1978, respectively.

22. In 1978, Dr. MacCorquodale joined the University of Arizona as a faculty member in the Department of Sociology. She was granted tenure and promoted to full Professor in the Departments of Sociology and Women's Studies for her ground-breaking research on topics including the challenges faced by women in traditionally male-dominated fields like law and engineering.

23. As a renowned scholar on gender and sexuality, Dr. MacCorquodale has published articles in leading academic journals, including "Women in the Law: Tokens or

5

Partners?" in *Gender & Society* and "Trying Transformations: Curriculum Integration and the Problem of Resistance" in *Signs: Journal of Women in Culture and Society*. She co-authored the book, *Changing Our Minds: Feminist Transformations of Knowledge*, which explores the development of academic disciplines in light of feminist scholarship.

24. On top of her scholarly work, Dr. MacCorquodale has participated in the Dean's Development Committee, the Provost's Council, the University Enrollment Management Council, and the Scholar Recruitment Leadership Team. Beyond her service to the UA, she served as President of the Western Social Sciences Association in 1987, and she served as an external reviewer for honors programs at the University of Utah, the University of Kansas, and the University of California at Irvine. Beginning in 2007, she served as the Founding President of the Arizona Honors Council, a statewide organization for deans of honors colleges and directors of honors programs. Dr. MacCorquodale also accepted positions serving as an Academic Visitor at the London School of Economics in 1999 and as a Visiting Scholar the Center for Research on Women at Stanford University in 1986.

25. In 1993, the University appointed her Director of the Honors Program, which preceded the Honors College. Following a successful year-long campaign spearheaded by Dr. MacCorquodale, the Honors program was formally established as a College in 1999, and Dr. MacCorquodale was appointed to serve as its inaugural Dean.

26. Under her tireless and enthusiastic leadership, the Honors College became an intellectual, cultural, and social hub of the University. The College annually awards $40,000 in undergraduate research grants, and over the past five years it has enrolled 632 National Merit Scholars, with 17% of Honors students holding double majors and 10% seeking double degrees. The College has facilitated unparalleled academic opportunities for UA students, including special interdisciplinary courses and seminars; provided undergraduate research funding, internships and study abroad; hosted literary, artistic, and musical events; offered academic and career advising; and supported students pursuing nationally and internationally competitive scholarships. Dr. MacCorquodale also oversaw

6

the opening of a new College dorm, established College-specific faculty positions, developed a new minor in Health and Human Values, and built the College through tireless recruiting and fundraising efforts. In recognition of these efforts, the University established the MacCorquodale Study Abroad Scholarship in her honor.

27. At the time that the University terminated Dr. MacCorquodale from her position as Dean of the Honors College in 2016, she oversaw 35 employees while managing a $3.7 million budget and bearing responsibility for more than 4,400 students. Alongside her research and teaching obligations, Dr. MacCorquodale worked as a liaison between the Honors College and other stakeholders in the UA community to build partnerships with alumni, parents, educators, and national and local organizations.

**C.     Dr. MacCorquodale's Complaints of Pay Discrimination**

28. When Dr. MacCorquodale was first appointed Dean of the Honors College in 1999, she was paid an annual salary of $96,849.

29. Soon after her appointment, upon reviewing salary data in the University Library, Dr. MacCorquodale learned that she was underpaid by tens of thousands of dollars relative to her male counterparts. The data revealed that Dr. MacCorquodale was the lowest paid dean among the eighteen academic deans, and that female deans were on the whole paid significantly less than male deans.

30. From 1999 to 2015, Dr. MacCorquodale routinely brought data she collected to the Provost's attention during her annual performance reviews. Based on these data, Dr. MacCorquodale complained that she was underpaid, but the administration disregarded her concerns and refused to close the pay gap. The University's disinterested attitude toward its marked gender-based pay disparities caused these disparities to persist, steadily building to a total disparity of hundreds of thousands of dollars over the years.

31. In or around July 2007, Dr. MacCorquodale wrote to then-Provost Eugene Sander to request an equity adjustment to her salary of $131,650, based on salary data available for the 2005-2006 academic year which showed that she earned considerably less than her male counterparts. Only after Dr. MacCorquodale made a formal complaint did

7

Provost Sander raise her salary by $17,033. This was nowhere near sufficient to bring Dr. MacCorquodale in line with her male peers, nor did it begin to make up for years of underpayment.

32. In subsequent years, Dr. MacCorquodale continued to complain about pay disparities to the current Provost, Dr. Comrie, and to seek equity adjustments. She supported her requests with comparative pay data unequivocally demonstrating that she was substantially underpaid relative to her male counterparts. Nevertheless, Provost Comrie consistently denied her any equitable adjustments, perpetuating the ongoing gender-based discrimination against her.

33. In her last three years as the Honors College Dean, Dr. MacCorquodale earned $153,000 in 2013-2014, $153,000 in 2014-2015, and $162,750 in 2015-2016, whereas the average male dean at the University made $308,309, $311,404, and $320,212, respectively, in those years. For example, during this period the University paid the Dean of the College of Fine Arts between $69,000 and $83,000 more annually than Dr. MacCorquodale, paid the Dean of the College of Education between $88,000 and $98,500 more annually, and paid the Dean of the Graduate College between $32,500 and $42,000 more annually. Each of these deans was less experienced than her in their respective roles.

34. Dr. MacCorquodale's position as Dean of the Honors College entailed at least the same level of skill, effort, and responsibility as was required of her male counterparts. During the 2015-16 academic year, the Honors College enrolled 4572 students – more than the combined graduate and undergraduate enrollment of every college at the University but three.[2] Dr. MacCorquodale was personally responsible for building and maintaining relationships not just with the faculty in her college but also with faculty throughout the University. She also had considerable responsibility for the well-being of

---

[2] The Colleges of Management, Science, and Social and Behavioral Sciences enrolled more students.

8

her students, beyond their academic work, that was not shared by other academic deans. Moreover, she had few support staff than deans of similarly-sized or smaller colleges, requiring her to become more deeply involved in every aspect of the Honor College's operations, from student recruitment to coordination with Residence Life.

35. At her 2015 performance review, Dr. MacCorquodale highlighted for Provost Comrie that there remained substantial differences in pay between her 2014-2015 salary and the salaries of comparable male deans, including the Dean of the College of Fine Arts, the Dean of the College of Education, and the Dean of the Graduate College – and that these differences persisted despite her status as the second-longest serving dean. The Dean of the College of Fine Arts, who only had a little over six years of experience as dean (ten years less than Dr. MacCorquodale), earned $83,000 more than Dr. MacCorquodale; the Dean of the College of Education, who had approximately twelve years of experience as dean (four years less than Dr. MacCorquodale), earned $98,449 more; and the Dean of the Graduate College, who had around three years of experience as dean (thirteen years less), earned $42,000 more.

36. The University ultimately agreed to adjust Dr. MacCorquodale's salary in February 2016 by $26,000. She interpreted the University's action as progress toward taking her concerns seriously, but this measure still did not make her salary commensurate with the salaries of male deans. When she reviewed the available pay data later, Dr. MacCorquodale realized this raise merely brought her salary into line with that of regular faculty in her academic department, based on her seniority, academic productivity, and service to the University.

37. In other words, before the adjustment, the University paid Dr. MacCorquodale thousands of dollars less than faculty members in her department who did not have deanships. After the adjustment, she still made substantially less than her male dean counterparts.

38. After Dr. MacCorquodale was forced to step down as Dean in September 2016, the University appointed Dr. Elliott Cheu, an associate dean in the College of Science,

to serve as Interim Dean of the Honors College for the 2016-2017 academic year. At the time of his appointment, Dr. Cheu did not have any prior experience as the dean of a college, having only served as an associate dean since 2008, and he had considerably less tenure at the University than Dr. MacCorquodale.

39. Dr. MacCorquodale learned shortly after she was forced to step down that the University offered Dr. Cheu a base full-time equivalent salary of approximately $275,000 – over $100,000 more than she was paid over the 2015-16 academic year – to serve only as interim dean. This enormous difference also represented a $90,000 increase over his salary as an associate dean. Notably, he made more as an associate dean than she did as a dean.

40. In July 2017, the University announced that it had appointed Dr. Terry Hunt, an anthropologist and Dean of the University of Oregon Honors College, as the new Dean of the Honors College at the University of Arizona. Dr. Hunt joined the UA with substantially less experience as a dean than Dr. MacCorquodale. Dr. Hunt served as Dean of the University of Oregon Honors College for only five years, during which time he had overseen a college of 800 honors students – less than 20% of the students at the University of Arizona Honors College. The University pays Dr. Hunt an annual salary of $230,000 – nearly $70,000 more than it paid Dr. MacCorquodale over the course of the 2015-16 academic year.

41. Dr. MacCorquodale's pay concerns were not limited to her own experiences. Upon information and belief, the University of Arizona has engaged in similar pay discrimination against other female deans by assigning them lower salaries than their male peers and refusing to make equity adjustments or, in some cases, not giving them any raises at all for periods of several years. A common decision-maker – the University Provost – was responsible for all pay decisions for all deans University wide.

42. The preferential treatment given to Dr. Cheu and Dr. Hunt – Dr. MacCorquodale's immediate successors – at her expense plainly shows that the striking

salary differentials between male and female deans at the University cannot be attributed to legitimate distinctions among the dean positions. Instead, they are based on gender.

### D. The University's Retaliation

43. Dr. MacCorquodale consistently complained of her unfairly low salary since around the time she was appointed Dean of the Honors College.

44. During Dr. MacCorquodale's annual review with Provost Comrie in August 2015, Dr. MacCorquodale raised further complaints of unequal pay. She also informed Provost Comrie that she would step down as Dean of the Honors College at the end of the 2016-2017 academic year, which marked the expiration of her five-year term as Dean. She notified him that she could not commit to another five-year contract, but indicated her intent to serve through the end of her term.

45. Provost Comrie and Dr. MacCorquodale agreed to these terms, after several rounds of negotiations, and, in February 2016, he notified her that he had memorialized the transition plan in a letter. While Dr. MacCorquodale did not receive a signed copy of the letter, she felt reassured that the plan had been committed to writing.

46. Accordingly, Dr. MacCorquodale began reaching out to faculty, alumni, donors and students to notify them of her intent to step down at the end of her term in June 2017.

47. However, at a meeting with Dr. MacCorquodale in May 2016, Provost Comrie unexpectedly announced that he would depart from the transition plan and instead would terminate her contract early, at the end of the 2015-2016 academic year. Not only did Provost Comrie's actions violate the terms of their agreement, but this measure was also inconsistent with the University of Arizona's policy of providing 90-day notice to employees, underscoring the fact that Dr. MacCorquodale's termination was a marked departure from the University's normal policies and practices.

48. The University's sudden refusal to honor the transition plan it had negotiated with Dr. MacCorquodale placed her in a difficult position, as it forced her to either reveal to faculty, alumni, donors, and students already aware of her departure plans that the

11

University was pushing her out, or to retract her earlier statements without providing an explanation. In either case, Dr. MacCorquodale would have been – and was – subjected to considerable embarrassment and speculation about whether her termination was disciplinary in nature.

49. Despite the University's unusual action of abruptly terminating her, Dr. MacCorquodale continued to work with Provost Comrie and others to ensure a smooth transition. In August 2016, Provost Comrie and Dr. MacCorquodale reached a new agreement in which she would teach or supervise the internship experience course for Honors students and assist the interim Dean with transition-related activities.

50. Around December 2016, Interim Dean Cheu instructed Dr. MacCorquodale not to supervise internships for Honors students, in violation of the transition agreement she had reached with Provost Comrie. Moreover, Dr. Cheu eliminated her Honors teaching assignment and informed her that she needed to apply in the future to teach specific courses, despite her status as Dean Emerita of the College and longstanding history of teaching Honors courses.

51. Notably, Provost Comrie failed to intervene on Dr. MacCorquodale's behalf to restore the terms of her transition agreement. In light of her exceptional reputation at the Honors College, Provost Comrie's continued unwillingness to advocate for Dr. MacCorquodale and protect their agreement raises additional concerns about his motivations in terminating her deanship.

52. Dr. MacCorquodale has experienced severe emotional distress as a result of the University's actions, as the speculation surrounding her departure has impacted negatively her professional reputation and her relationships with countless friends, colleagues, students and alumni. Moreover, Provost Comrie's failure to address Dr. Cheu's unjustified removal of Dr. MacCorquodale's responsibilities at the Honors College has exacerbated the considerable stress and anxiety she already felt as a result of the sudden end to her affiliation with the Honors College.

//

//

### E. The University's Pattern of Discriminatory Misconduct Toward Female Deans

53. Pay discrimination is part of a broader pattern of discrimination against female deans. The Deans' Council, led by Provost Comrie, is primarily composed of men. Among the eighteen academic deans at the University of Arizona, there have been, at most, five female deans, including Dr. MacCorquodale, within the past three years. For the current 2017-2018 academic year, there are only three female deans, with a fourth serving in an interim capacity.

54. The University's leadership, and Provost Comrie in particular, has perpetuated a culture that marginalizes, demeans, and undervalues women. The University has discriminated against women by allowing its predominantly male leadership to favor men overtly in pay and subjecting women to differential treatment. Unlike the male deans, female deans have been subjected to sexist comments and increased scrutiny over their performance, and their contributions have been overlooked by the Provost.

55. Upon information and belief, Provost Comrie has a history of making sexist and demeaning comments towards female deans. For example, in a meeting with a female dean, Provost Comrie inappropriately criticized her appearance, stating that she should wear skirts more often – a comment that was wholly irrelevant to her job. In the same meeting, he also told this female dean that another female dean had a "Hillary Clinton complex." As a result of such misconduct, at least one female dean left her deanship at least in part to escape discriminatory misconduct by Provost Comrie. A departing female dean remarked that she believed that her college would be treated better by Provost Comrie if she were succeeded by a man.

56. Provost Comrie's bias against female deans was particularly pronounced at meetings of the Deans' Council. Under Provost Comrie's leadership, these meetings were driven primarily by men. Whereas Provost Comrie often solicited the participation of male deans, female deans had to make considerable efforts to participate in discussions. Provost

Comrie routinely disregarded the input and contributions of female deans, and only after they were echoed by male deans would he pay any attention. Indeed, the overrepresentation of men in the Deans' Council is the product of continuing systemic discrimination against female employees, epitomizing and perpetuating an old boys' club atmosphere at the highest levels of the University's academic leadership.

57. Provost Comrie's conduct is particularly notable and alarming in light of his near-total control over deans' pay. Provost Comrie's attitude and behavior towards women played a prominent role in his compensation decisions and refusal to make appropriate equity adjustments for women who were underpaid relative to their male peers.

## V.    COLLECTIVE ACTION ALLEGATIONS (EQUAL PAY ACT)

58. The University has engaged in systemic gender discrimination against its female deans. The University has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making in the Office of the Provost.

59. Dr. MacCorquodale re-alleges and incorporates by reference each and every allegation in the previous paragraphs alleging common practices and procedures resulting in unequal pay earned by female deans at the UA.

60. Dr. MacCorquodale brings collective claims alleging violations of the EPA, as a collective action pursuant to 20 U.S.C. § 216(b) on behalf of all members of the EPA Collective Action Class. The EPA Collective Action Class consists of all female employees who are or have been employed by Defendant as a dean at the University of Arizona going back three years from the dates they join this action, plus any additional tolling ordered by the Court.[3]

---

[3] The three-year period is based on the FLSA/EPA's three-year statute of limitations for willful violations, 29 U.S.C. § 255(a).

61. Dr. MacCorquodale seeks to represent all female deans at the University, and maintains that they were paid less than male deans for performing substantially equivalent work. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

62. Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C § 216(b) because Plaintiff's claims are similar to the claims of the EPA Collective Action Class.

63. Dr. MacCorquodale and the EPA Collective Action Class are similarly situated under the EPA because they (a) share common job positions and responsibilities and (b) are subject to Defendant's common compensation policies, practices, and procedures and centralized decision-making that resulted in unequal pay based on sex. Because of these common practices, Defendant failed to compensate female deans at a level commensurate with male deans who perform substantially equal work in equivalent job positions.

## COUNT 1

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EPA, 29 U.S.C. §§ 206(d), 216(b)**

**DENIAL OF EQUAL PAY FOR EQUAL WORK**

**(On Behalf of Plaintiff, in Her Individual and Representative Capacities, and the EPA Collective Action Class)**

64. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

65. This Count is brought on behalf of Plaintiff in her individual and representative capacities, and EPA Collective Action Plaintiffs.

66. Defendant has discriminated against Plaintiff and the EPA Collective Action Class in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the EPA. Defendant has paid Plaintiff and the EPA Collective Action Class less than similarly-situated male colleagues performing equal work in comparable job

positions, which require equal skill, effort, and responsibility and which are performed under similar working conditions.

67. Defendant subjected Plaintiff and the EPA Collective Action Class to common discriminatory pay policies and other forms of discrimination affecting pay.

68. The differential in pay between male and female employees was not due to seniority, merit, or quantity or quality of production, but rather was due to gender.

69. Defendant caused, attempted to cause, contributed to, or caused the continuation of the wage rate discrimination based on sex in violation of the EPA. Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

70. As a result of Defendant's conduct alleged in this Complaint, Plaintiff and the EPA Collective Action Class have suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

71. By reason of Defendant's discrimination, Plaintiff and the EPA Collective Action Class are entitled to all legal and equitable remedies available for violations of the EPA including back pay, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT 2

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EPA, 29 U.S.C. §§ 215(a)(3), 216(b)**

**RETALIATION**

**(On Behalf of Plaintiff)**

72. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this complaint

73. Plaintiff engaged in protected activity under the EPA by complaining to Defendant about gender discrimination in compensation.

74. Because of these complaints, Defendant terminated Plaintiff's tenure as Dean of the Honors College earlier than the previously agreed-upon date for Plaintiff to step down as down as Dean. Defendant also engaged in other retaliatory conduct.

75. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA including back pay, liquidated damages, prejudgment interest, attorneys' fees, costs, and other relief pursuant to 29 U.S.C. § 216(b).

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the EPA Collective Action Class, prays that this Court:

A. Certify the claims in Count 1 as a collective action under the EPA on behalf of Plaintiff and the EPA Collective Action Class; designate Plaintiff as representative of the EPA Collective Action Class; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Collective Action, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations on the claims of all members of the Collective from the date the original Complaint was filed until the Collective  Action members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

B. Declare and adjudge that Defendant's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiff and members of the EPA Collective Action Class;

C. Issue an injunction against Defendant and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with it from engaging in any conduct violating the rights of Plaintiff, and those similarly situated as secured by the Equal Pay Act, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and

from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

D. Order Defendant to adjust the wage rates and benefits for members of the EPA Collective Action Class to the level that they would be enjoying but for Defendant's discriminatory policies, practices, and/or procedures;

E. Award back pay, front pay, lost benefits, and other damages for lost compensation and job benefits suffered by Plaintiff and members of the EPA Collective Action Class, in an amount not less than $1,000,000;

F. Award compensatory and liquidated damages to Plaintiff and members of the EPA Collective Action Class, in an amount not less than $1,000,000;

G. Order Defendant to make Plaintiff and members of the EPA Collective Action Class whole by providing them with any other monetary and affirmative relief, including relief necessary to compensate Plaintiff for the harm incurred to her reputation and for emotional distress;

H. Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiff and members of the EPA Collective Action Class;

I. Award Plaintiff and members of the EPA Collective Action Class all pre-judgment interest and post-judgment interest available under law;

J. Award Plaintiff and members of the EPA Collective Action Class any other appropriate equitable relief, including equitable relief necessary to repair damage caused by Defendant to Plaintiff's reputation;

K. Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and such practices are determined to be in full compliance with the law; and

L. Award additional and further relief as this Court may deem just and proper.

//

**VII.  JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable of right by jury.

| | |
|---|---|
| Dated: January 22, 2018 | Respectfully submitted, |
| | /s/ Merle Joy Turchik |
| | Merle Joy Turchik (AZ Bar No. 011130) |
| | TURCHIK LAW FIRM, P.C. |
| | |
| | David Sanford (*Pro Hac Vice forthcoming*) |
| | Andrew Melzer (*Pro Hac Vice forthcoming*) |
| | James E. Richardson (*Pro Hac Vice forthcoming*) |
| | SANFORD HEISLER SHARP, LLP |
| | |
| | *Attorneys for Plaintiff and the EPA Collective Action Class* |

[*Continued from Caption Page*]

James E. Richardson (NY Bar No. 4810735, *Pro Hac Vice forthcoming*)
Sanford Heisler Sharp, LLP
111 Sutter Street, Suite 975
San Francisco, CA 94104
jrichardson@sanfordheisler.com
Telephone: (415) 795-2024
Facsimile: (415) 795-2021

Andrew Melzer (NY Bar No. 4270682, *Pro Hac Vice forthcoming*)
Sanford Heisler Sharp, LLP
1350 Avenue of the Americas, 31st Fl
New York, NY 10019
amelzer@sanfordheisler.com
Telephone: (646) 402-5657
Facsimile: (646) 402-5651

*Attorneys for Plaintiff and the EPA Collective Action Class*